JANUARY TERM, 1882, No. 65.          MARCH 8TH, 1882.

# Appeal of John Horner *et al.*

The payee and holder of sealed notes, about ten days before his death, said to a third person that he did not want the maker to pay them. Within forty-eight hours of the time of his death he sent for the maker to draw his will. He directed the notes to be deducted from an estimate of his personalty, and told the maker that the notes were his; that they were in a drawer in another room; that the key of the drawer was in a secretary in the room where he lay, and told him to get the notes. He appointed the maker one of the executors of his will. After the departure of the maker he told his housekeeper that he had now fixed his things the way he wanted them, and that he had given the notes to the maker (naming him). Four or five days after his death the maker took possession of the notes. *Held*, That there was no delivery of the notes sufficient to render the gift complete.

Before Sharswood, C. J.; Mercur, Gordon, Paxson, Trunkey, Sterrett, and Green, JJ.

Appeal of John Horner and Samuel Smith from the decree of the Orphans' Court of *Northampton County*, confirming the report of an auditor appointed to distribute the estate of Thomas Clendennin, deceased.

Thomas Clendennin died unmarried in 1879, leaving a will in which, after certain specific bequests and devises, he gave and devised the residue " unto the children of my late sisters, Jane and Esther, to be shared equally amongst them." Of this will he appointed as executors the appellants, John Horner and Samuel Smith. They filed an account, which was referred to H. W. Scott, as auditor, to settle and make distribution. The auditor reported, *inter alia*, the following facts:

John Horner had borrowed money from the testator in his lifetime for Horner's sister, which was eventually lost. As security for the loan Horner gave two notes, under seal, one for $1462.22, dated April 1st, 1875, at one year, and the other, dated April 2d, 1877, for $697.44, at one year. These notes were found by the executors among other papers of the testator in a bureau in the spare-room of his dwelling. Horner took the notes into possession at the time he found them, and claimed them as his own. This was five or six days after the death of the testator. Horner put the notes in his pocket-book and retained possession of them. They were produced before the appraisers, but were not included in the inventory or account.

*Samuel Smith* testified, *inter alia:*

" I had a conversation with Mr. Clendennin about ten or twelve days before his death about these notes of John Horner's. He was complaining of being sick some, but sat up. He was not very feeble. He told me that he didn't want John Horner to pay back those notes any more. He said John got that money for his sister, and he says, 'I guess that money is lost.' He said, 'I can afford it better than John.' He used these words: 'I don't want John to pay that money back.' He had spoken to me before about the notes. I couldn't say that he mentioned how much it was. He told me before that it was something like $2000. That was the only claim, and these the only notes he spoke about ever as holding against John. Didn't have the notes out that day. He didn't tell me to say that to John."

*John Horner*, having been called by the opposite party, and being recalled, testified, under objection as to his competency, as follows:

"He (testator) asked me to write a will for him. I said I would; we got ready to go to work. First, he said, I should do some figuring, and make an estimate for him over his personal property. He handed me a memorandum of his papers—names of parties he had papers against. He said I should mark what I considered good and what bad. I took the papers and made a list. I proved it up at his request to see what it amounted to. My notes were on the list he had. Then I commenced writing by his directions. While writing, he said he wanted to mention me in the will. While writing it, I said I would prefer to be not mentioned. Then he said the notes which he held against me were mine. Those notes, then, were not included in the estimate; he requested me to deduct them from the estimate I had made. He told me where the notes were. He said they were in the drawer in the other room; I think he said in the upper drawer. The key he said was in the secretary in that room where he was. He told me to get the notes; I said it was late, I would leave them until I came up again. He said very well, or something to that effect. When he told me to get the notes, that was the time he told me where I could find the key. I did not get up until after his death. I lived away from him about a mile and a half. The next day I had to go away from home, and Thursday morning I was getting ready to go up when they sent for me to say he had died. The first time I saw the papers was after the funeral, when I took possession of the notes in the way I have described."

Cross examined:

"He didn't have any papers that day of the will except this memorandum. I didn't see my notes. . . . . . I didn't see these notes of my own at all until four or five days after his death—until I had qualified as executor. They were for money which I had borrowed and not repaid. When I got the notes out after his death they were locked up in his bureau. Julia Lilly, his housekeeper, brought the key. The papers, my notes and others, as I remember now, were tied up in a bundle together. It had been a year or afterwards before when I last saw these notes. When I wrote that will I didn't consider him that night in any danger. I wrote this will in the room at the west of the house; the papers we found in the bureau in room at the west end of the house. Was not in that room at all the night I wrote the will."

*Julia Lilly* testified:

"I lived with Thomas Clendennin, deceased, in his lifetime, about thirty years. I was his housekeeper. . . . . I

[Appeal of John Horner *et al.*]

went into Mr. Clendennin's room that night after Mr. Horner left. That was the last time Mr. Horner was there before Mr. Clendennin's death. I had some conversation with Mr. Clendennin. He said he had now fixed his things the way he wanted to have them. He had said John should go and get those notes; that John had said it was so late; that he would come another time and get them. He didn't say anything more; I can't remember that he said anything more. . . .

" He said that these notes were for money that John had got for his sister, and that it was lost; now John should have it. . . . He said he.had now fixed his things the way he wanted it. Then he had said to John he should go over and get the notes. John had said it was so late he would come another time and get them. He then said he had given this money to John for his sister, now it was lost and he would let John have it. Don't remember anything else.

" Q. State whether or not he said anything about having given John the notes that night?"

Objected to as leading question and for reasons stated above.

" A. Yes; he said he wanted John to get the notes, but John said it was too late. That is all he said."

" Q. State whether or not he said anything about telling John the notes were his?"

Objected to.

" He said John had better come up and fix his things. He said that John was to come up. He didn't say what John was to do when he came up. He didn't say that night anything about what he had done with the notes. He said that John should have those notes. I talked with Mr. Hamersley this morning and some time ago. I told Mr. Hamersley that Mr. Clendennin said to me, ' Now I have fixed my worldly affairs to suit me and I have given John Horner his notes, but as it was so late John said he could get them when he came over again. He can have them ; they are his,' and Mr. Clendennin said that to me. That is all I remember."

*Cross-examined.* " Mr. Clendennin began the conversation. The first thing he said, ' I have fixed these things the way I want them.' I said nothing. He then said he had told John he should go over and get those notes. He said John said it was too late. He said, ' Come over another time.' Then he said nothing any more. I have now said every word that Mr. Clendennin said. He said nothing else. This was Tuesday night, and he died early Thursday morning. He was sick then, but not bad. He didn't lie down.

The old man talked English. I don't understand every-thing in English, but pretty near."

Counsel for the residuary devisees and legatees asked the auditor to surcharge the executors with the amount of these notes.

The auditor found the facts to be :

1. The language used by the decedent in relation to the supposed gift was in consequence of his expectation of ap-proaching death, in his last sickness, but not indicating im-mediate or speedy dissolution.

2. That the donor died within forty-eight hours after-wards in the manner, substantially, as expected by himself, and that the supposed gift was not revoked in his lifetime.

3. That he made and executed his last will and testament after making the supposed donation.

4. That the donor did not deliver to the donee by manual tradition the supposed gift.

5. That the donee had the power at the time of the supposed gift to reduce into his actual possession the choses in action which were the evidences of indebtedness the donor in-tended to forgive.

6. That these choses in action were in another and non-communicating room from the donor and the donee, tied in a bundle with other securities, locked in a bureau drawer, the key of which was in the room with the donor.

7. That the key to this drawer was not delivered by man-ual tradition to the donee, nor taken into his possession, but that he was directed to get it by the donor.

The auditor held that no title vested in the donee, and surcharged both of the accountants with $2804.85, the amount of the notes and interest.

To this finding the accountants excepted, *inter alia.*

The Court dismissed the exceptions and confirmed the report.

The accountants then appealed, assigning that the Court erred in dismissing the exceptions and confirming the re-port.

*W. S. Kirkpatrick, W. E. Doster*, and *R. C. Hamersley*, for the appellants.

The elements of a complete gift are: (1) Words or acts of present meaning importing an intention to give; (2) imme-diate surrender of dominion ; (3) acceptance by the donee ; (4) irrevocability.

Manual delivery is, perhaps, the most satisfactory evidence. of these elements, and it may be insisted on as a matter of policy, except where these essential elements are otherwise

294 SUPREME COURT [*Philadelphia*,

clearly and satisfactorily shown. To lay down an unbending rule that manual tradition is the only proof of these elements of a gift is to ignore the principle, and seize upon a mere technical formula. It would seem upon first blush as if the principal cases in our Pennsylvania books established the inexorable rule that no gift could be complete without a corporal delivery of the thing, or in case of a debt, of the written security; but it will be found that in all the cases the difficulty was that there were not words of present meaning, or else there was an indication of purpose not to part with the entire control of the thing or security, or its taking effect was upon some future condition or event: Campbell's Estate, 7 Barr, 100 ; Kidder *v.* Kidder, 9 C., 268 ; Mechling's Appeal, 2 Grant, 158; Zimmerman *v.* Streeper, 25 P. F. Smith, 147; Trough's Estate, 25 P. F. Smith, 115 ; Crawford's Appeal, 11 P. F. Smith, 52.

The case in hand shows a present intention to relinquish dominion and irrevocability. The language and conduct of the decedent indicated this, and his pains to impress upon Julia Lilly the idea of its being a completed transaction is confirmatory thereof. The notes were placed at Horner's disposal on the night in question. He accepted them and then left them in their place as his property. The testator, if they were still in any way in his possession, was as much a bailee or trustee as though he had gone through the mummery of taking them in his hands, depositing them in Horner's hand, and then the latter returning them with a direction to keep them for him until he came again. As a matter of convenience Horner left them where they were : Crawford's Appeal, 11 P. F. Smith, 52; Flowers's Case, Noy, 67 ; Herr's Appeal, 5 W. & S., 494.

In the analogous case of deeds it has been repeatedly held that there may be a delivery or passing of the title thereby, without the deed leaving the hands of the grantor: Chess *v.* Chess, 1 P. & W., 32; Blight *v.* Schenck, 10 Barr, 285; Stephens *v.* Rinehart, 22 P. F. Smith, 434; Diehl *v.* Emig, 15 P. F. Smith, 320; Morgan *v.* Malleson, 10 L. R. Eq., 475.

*Edward J. Fox*, for the appellees.

There was no release, cancellation or delivery of the notes: Campbell's Estate, 7 Barr, 100; Kidder *v.* Kidder, 9 Casey, 268 ; Trough's Estate, 25 P. F. Smith, 115.

MARCH 20, 1882.—PER CURIAM: Taking all the evidence there was no delivery of the notes sufficient to render a gift complete. There was no actual handing over of the notes to the donee. The alleged donor did not even deliver the

key of the drawer where they were. He told the donee where
the notes were and where the key was, but the donee never
took possession until after the death of the donor. Our
cases are all uniform and consistent upon this point:
Trough's Estate, 25 P. F. Smith, 115.

Decree affirmed and appeal dismissed at the costs of
the appellants.